

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 3, 2025

**BY ECF**
The Honorable John P. Cronan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re:  *United States v. Herman Brightman,* 23 Cr. 642 (JPC)

Dear Judge Cronan:

  The Government respectfully submits this letter in connection with the sentencing of defendant Herman Brightman, a/k/a "Nazir Griffith," a/k/a "Nazir Luckett," which is scheduled for April 8, 2025. For the reasons discussed below, the Government respectfully submits that a sentence of 120 months' imprisonment and a fine of $9,632 is warranted in this case and is no greater than necessary to reflect the harm the defendant has inflicted, his history and characteristics, to provide adequate deterrence, to protect the public, and to promote respect for the law.

  Herman Brightman preyed on women. He used elaborate ploys to deceive women he met on the internet into believing that he was a medical professional—a nurse—to earn their trust. He lured them to go on dates with him, sometimes to develop long-term relationships with him. And then he twisted that trust like a knife to hit, to punch, to threaten, and to take hostage. He did this to woman after woman, knowing what he did was wrong, and openly flouting the law because he knew domestic violence allegations are often under-reported, hardly investigated, and because he believed that he could cow these victims into silence. And he was right for a time. But no more. Four women bravely came forward so that Brightman could be stopped. When the women at the center of this case met defendant Herman Brightman over the internet, they had no idea how much their lives would change. They did not know that the defendant would strangle them, threaten to kill them, and hold them hostage. They did not know that despite their 911 calls, police reports, and even a restraining order, the defendant would continue to contact them. They did not know, when they decided to go on a first date with the defendant, that they would eventually need to move, leave their jobs, and, in some cases, leave the city. The defendant left indelible marks on their psyches. Justice demands a substantial sentence commensurate with the irreparable damage the defendant inflicted on the victims.

  **A. Offense Conduct**

From in or about the end of 2021 to in or about August 2023, Brightman posed as a nurse on the Internet and met women on Facebook and Hinge.  Brightman manipulated each of the women to date him and once he has gained their trust, he used violence against each of these women.  The defendant's conduct as to each of the four victims are recounted below:

<u>Victim-1</u>

In or about November of 2021, Victim-1 met Brightman on Facebook.  Brightman told Victim-1 that he was a nurse working at a hospital at the time.  In reality, though Brightman had been hired as a temp worker at various hospitals, he was not and has never been a registered nurse.  Victim-1, a single mother who had immigrated to the United States and had lost her job briefly in 2020 due to the COVID-19 pandemic, believed Brightman and the two began dating.  Not long after, Brightman became violent toward Victim-1, causing Victim-1 to call the police multiple times.  On or about June 7, 2022, Victim-1 told police officers that Brightman had attempted to strangle her with his hands in Port Authority.  (Presentence Report ("PSR") ¶ 51).  Below are photos taken by police officers of the marks that Brightman left on Victim-1.

 

Later the same month, on June 26, 2022, Victim-1 had been traveling in a car in the Bronx with Brightman and her minor child ("Minor Victim-1"), who was only approximately two years old at the time, when Brightman pulled over, and forced Victim-1 and Minor Victim-1 out of the vehicle, and hit Victim-1.  (PSR ¶ 52).  Below is a screenshot of a video that was taken by a bystander.

Hon. John P. Cronan                                                                                   Page 3
April 3, 2025



The disturbance was such that a bystander called 911 to report the incident.  By the time the police came, Brightman left the scene in the car, leaving behind Victim-1 and her child, who did not live in the Bronx.  The police again took pictures of Victim-1's injuries, some of which are included below:

 

Hon. John P. Cronan                                                                 Page 4
April 3, 2025

Victim-1 subsequently obtained an order of protection against Brightman and an i-card to arrest Brightman was issued by the New York City Police Department ("NYPD").

Despite the order of protection Victim-1 obtained, Brightman continued to contact Victim-1. On or about July 20, 2022, Brightman traveled to Vicim-1's home in Mount Vernon then drove her and her two-year old child to Brightman's home in New Jersey, arriving there at about 2 a.m. (PSR ¶ 55). Victim-1 reported to law enforcement officers the next day—and again over a year later when she met with the Government in this case—that she went with Brightman to his New Jersey home because he had put a boxcutter to her hip. It is undisputed that according to cellphone location information, Brightman left Victim-1's apartment in Mount Vernon at approximately 1:23 a.m., and that Victim-1 called 911 from Brightman's New Jersey apartment at approximately 12:11 p.m. the next day. (PSR ¶¶ 55-56). During this recorded 911 call, Victim-1 told the police that Brightman held a knife to her the previous night when she and her child were brought from Westchester to New Jersey, and that they were being held against their will at Brightman's apartment. (PSR ¶ 56). Victim-1 then whispered to the police that while she could not answer the door—for fear of Brightman—she could leave the door slightly ajar for their entry. (PSR ¶ 56). The police arrived at Brightman's New Jersey apartment approximately twenty minutes later. (PSR ¶ 57). By the time they arrived, the door was unlocked—as Victim-1 said she would do—and the police found Victim-1, her two-year old minor child, and Brightman all inside the apartment. (PSR ¶ 57). Victim-1 and her two-year old minor child were taken to the local precinct, where they sat on a steel bench for hours. The police then took her statement—when she recounted being forced to go to Brightman's apartment against her will and told the police that Brightman had assaulted her and attempted to strangulate her—and took photos of the inside of Victim-1's lips, which showed slight bruising. (PSR ¶ 57). A picture of her injuries is included below:



Meanwhile, at the police station, police officers told Brightman that based on his lack of criminal record, he will likely be released later that day. And indeed, despite being charged in five counts, including kidnapping, aggravated assault, terroristic threats, and unlawful possession of a weapon, Brightman was released on bail.

<u>Victim-2</u>

Victim-2 met Brightman through Hinge, an online dating platform, in May 2023. (PSR ¶ 17). Brightman claimed that he worked as a nurse practitioner at New York Presbyterian Hospital in Manhattan, and told Victim-2 that his name was "Nazir Griffiths." (PSR ¶ 17). He and Victim-2 began a romantic relationship. Within weeks of meeting in person—in approximately June 2023—Brightman claimed that he had lost his job and began staying at Victim-2's apartment almost every night. (PSR ¶ 18). Brightman has never been a licensed nurse or nurse practitioner in New York State, and did not hold any employment in 2023. (PSR ¶¶ 16, 136–37).

On or about July 24, 2023, following an argument in which Brightman accused Victim-2 of speaking to another man, Brightman got physical for the first time with Vicim-2. He pushed Victim-2 into her bedroom, said that he was going to "wreck this whole shit," and then began pulling Victim-2's curtains from the wall, ripping the blinds, and destroying other items in Victim-2's apartment. (PSR ¶ 19). After this incident, Brightman became increasingly more aggressive towards Victim-2 in arguments, and Victim-2 began to fear that Brightman may hit her.

Approximately two weeks later, on or about August 7, 2023, Brightman and Victim-2 had another argument. Brightman started to pack up as if to leave and then started to scream at Vicim-2 that she did not respect him. Brightman then told Victim-2 to go into her bedroom, which she did, and Brightman began destroying items on Victim-2's office desk outside her bedroom. (PSR ¶ 20). Brightman then came into the bedroom with a computer monitor and smashed it in front of Victim-2. (PSR ¶ 20). He then went into the kitchen, walked back into the bedroom with a knife, and stabbed Victim-2's phone with the knife, breaking the screen. (PSR ¶ 21). While shaking the knife at Victim-2, Brightman asked Victim-2, in substance, which part of her body she wanted him to cut. (PSR ¶ 21).

Brightman then walked to the window of the bedroom, pulled the blinds closed, turned on the air conditioner to create noise, and told Victim-2, in substance: "there's nobody here. I'm going to kill you here today." (PSR ¶ 21). Brightman then jumped on top of Victim-2, who was on the bed, put his hand on her mouth, and held the knife to her side. Brightman told Victim-2, in substance: "I don't want to see you again. I don't want to talk to you again. I'm going to gut you like a fish." (PSR ¶ 21). Victim-2 felt the tip of the knife against her body.

At some point, Brightman appeared to calm down and got off of Victim-2. Brightman then told Victim-2 to sit on her legs in the small space between the bed and the bedroom window. When Victim-2 adjusted her position to a more comfortable sitting arrangement, Brightman demanded that Victim-2 not move, went into the living room, and returned with tape, which he used to tape Victim-2's mouth and hands. (PSR ¶ 22). As Brightman was taping Victim-2, she began to shake and cry. (PSR ¶ 22). Upon seeing Victim-2's reaction, Brightman took the tape off Victim-2's hands and mouth and left the bedroom. (PSR ¶ 22).

After the attack, Victim-2 became terrified of Brightman and wanted to break up with him. (PSR ¶ 22). Victim-2 was afraid to do so, however, fearing that ending the relationship or telling Brightman to leave the apartment (where Victim-2 lived alone) would cause him to become violent again. (PSR ¶ 22). Eventually, on August 13, Victim-2 had family coming to the apartment and used their arrival as an excuse to ask Brightman to leave, which he did. (PSR ¶ 23). Later that day, after Brightman left her apartment, Victim-2 called Brightman and told him that she wanted

to break up with him.  (PSR ¶ 23).  Although Brightman said that he was coming back to Victim-2's apartment, she begged him not to since she had family there.  (PSR ¶ 23).

The next day, August 14, Brightman repeatedly called Victim-2.  (PSR ¶ 24).  Victim-2 recorded one of their calls.  On that call, Brightman told Victim-2 he was upset at her for "putting the blame on" him.  (PSR ¶ 24).  Victim-2 explained that she was not happy, that she was scared, and that when she saw Brightman calling her, her heart started "beating heavy."  Brightman responded, in substance, "you got it bro" and "we can both play dirty." (PSR ¶ 24).  After Victim-2 explained that she waited until Brightman left the apartment to break him up with him because she was scared, and repeatedly pleaded with him that she did not want any issues, Brightman told her: "You got it bro, now we're going to have issues."  (PSR ¶ 24).  Victim-2 continued to explain to Brightman that she was afraid of him, and, after some additional back and forth, Brightman said that he was going to "get even."  (PSR ¶ 24).  When Victim-2 responded: "I'm already afraid of you, you don't think you've done enough?  You don't think you've done enough to me already?" Brightman replied "no, no, no," and continued to say that he was going to "get even."  (PSR ¶ 24).

After the call, Victim-2 packed her belongings and left the apartment, and she never moved back.  (PSR ¶ 25).  Brightman continued to call and text Victim-2 throughout August and into September, sometimes using private numbers.  (PSR ¶ 25).  In the early morning hours of September 6, 2023, Victim-2 received several missed phone calls, including one at 5 a.m.  (PSR ¶ 26).  Later that morning, Victim-2 called back one of the numbers, which she did not recognize, and spoke to Victim-3.  After learning that Brightman had also been violent to Victim-3, Victim-2 reported the August 7, 2023 incident in which Brightman threatened her with the knife to the police later in the day on September 6, 2023.

Victim-3

In August 2023, shortly after Brightman attacked Victim-2, Victim-3 communicated with Brightman on the Hinge dating platform.  (PSR ¶ 27).  Brightman's online profile stated that he worked as a nurse practitioner, and Brightman told Victim-3 that he worked at Columbia Presbyterian hospital.  (PSR ¶ 27).  Victim-3 agreed to meet Brightman in person after they matched on Hinge.  Like Victim-2, Victim-3 knew Brightman as "Nazir Griffith."  (PSR ¶ 27).

Victim-3 and Brightman went on several dates.  During one of those dates, Brightman angrily accused Victim-3 of interacting with another man.  (PSR ¶ 28).  That altercation led Victim-3 to become wary of Brightman, and she began to limit her communications with him. (PSR ¶ 28).

Shortly after midnight on Wednesday, September 6, 2023, Brightman called Victim-3 repeatedly.  (PSR ¶ 29).  Eventually, Victim-3—who was asleep—answered.  Brightman said that he was outside Victim-3's apartment building and asked her to come outside.  (PSR ¶ 29).  Given that Brightman had called Victim-3 multiple times in the middle of the night, and out of concern that he knew which apartment she lived in, Victim-3 went downstairs to meet Brightman, who was in his car.  (PSR ¶ 29).  Brightman told Victim-3 that after an in-person meeting with a different woman that Brightman had recently met on Hinge, Brightman brought her to his apartment in New Jersey, where the police stopped him.  (PSR ¶ 29).  Brightman claimed that he fled from New

Hon. John P. Cronan                                                                                    Page 7
April 3, 2025

Jersey to Victim-3's apartment.[1]  He told Victim-3 that she was responsible for what happened, asserting that if she had not stopped talking to him, Brightman would not have needed to go back on Hinge.  (PSR ¶ 29).

Brightman asked Victim-3 for her phone, but she refused to give it to him.  (PSR ¶ 30). Brightman then asked Victim-3 to call a number and say that Brightman was in trouble and needed help; Victim-3 called the number several times, but the person (Victim-2) did not answer.  (PSR ¶ 30).  At some point, Brightman punched Victim-3 in the arm while they were inside Brightman's car, giving Victim-3 a bruise.  (PSR ¶ 30).  When Victim-3 got out of the car to walk away, Brightman chased after her, put her in a headlock with one arm, and put his other hand over her nose and mouth, making it difficult for her to breathe.  (PSR ¶ 30).  Victim-3 tried to scream but she was unable to do so.

Brightman stopped choking Victim-3, and, in an effort to pacify Brightman, Victim-3 stayed outside with Brightman to calm him down until she could find an opportunity to escape. (PSR ¶ 31).  When Victim-3 had the chance to do so, she ran back into her apartment building. Brightman chased after her.  Victim-3 ran up the stairs and got inside her apartment just as she heard the stairwell door close behind her.  (PSR ¶ 31).  At just after 5 a.m., Victim-3 called 911. By the time police arrived approximately 10 or 15 minutes later, Brightman had left.

Beginning at approximately 5:13 a.m. that morning, Brightman sent 16 text messages to Victim-3, in rapid succession, writing, among other things: "I'm scared[.]  Baby plz[.]  On my life I need u[.] I'm losing my dad losing everything[.]  Don't leave me hanging[.]  Please help me [ . . .] You sending me to voicemail why are you working against me [ . . .] You just looking at my messages ignoring me knowing I'm hurting."  Victim-3 responded: "You hit me numerous times." (PSR ¶ 31).  Brightman continued with another string of over a dozen text messages, which included the statements: "Why are you ignoring me the more you ignore me the more you making me angry[.] I don't wanna pop up to your job[.]"

Brightman made good on that threat five days later.  On September 11, 2023, while Victim-3 was waiting for the bus to go home from work, Brightman approached her from behind and asked her if she had called the police on him.  (PSR ¶ 32).  Victim-3 pretended to not know what Brightman was talking about.  When the bus arrived, Brightman followed Victim-3 onto the bus.  He became increasingly aggressive and repeatedly asked for another chance, reiterating that he knew where Victim-3 lived.  (PSR ¶ 32).

In an attempt to escape Brightman, Victim-3 exited the bus early and went inside a supermarket.  But Brightman followed her inside.  (PSR ¶ 33).  When Victim-3 left the supermarket, Brightman continued to follow her.  Eventually, Victim-3 told Brightman that he needed to leave, at which point he became angry and threw a traffic cone at her, tried to grab her

---

[1] According to law enforcement records, a woman reported that, shortly after midnight on September 6, 2023, Brightman drove her against her will to his apartment in New Jersey, and she was eventually able to call 911 from the street corner.  (PSR ¶ 96).  At approximately 3 a.m. that morning, officers from the Guttenberg (New Jersey) Police Department observed a car matching the description that the caller reported.  The driver—whom one of the police officers recognized as Brightman from the July 2022 arrest with Victim-1—refused to exit his vehicle and eventually sped away.  (PSR ¶ 96).

purse (which contained the paperwork she had received from the police), and pushed her to the ground. (PSR ¶ 33). Victim-3 attempted to run inside a restaurant and pleaded with one of the restaurant security guards for help, but he told her not to go inside. (PSR ¶¶ 33). Meanwhile, Brightman continued to follow Victim-3. Seeing that she could not get any outside help, Victim-3 decided to try to placate Brightman. She promised that she would call him, and let Brightman repeatedly hug and kiss her so that he would leave without furthering hurting her. Finally, after convincing Brightman that Victim-3 was willing to get back together with him, Brightman left Victim-3. (PSR ¶ 33). Victim-3 went to the 40th Precinct on September 13 and reported the incident. By that time, NYPD detectives had identified "Nazir Griffiths" as Brightman.

The next day, September 14, 2023, members of the NYPD apprehended Brightman and arrested him on charges related to Victim-2 and Victim-3. He was released on bail. While on bail, he continued to call and FaceTime Victim-3, in violation of the order of protection that Bronx Criminal Court had issued days earlier. (PSR ¶ 34).

<u>Victim-4</u>

In approximately August 2023, Brightman began communicating with Victim-4 on the Hinge dating platform, and they eventually exchanged phone numbers. (PSR ¶ 35). Brightman, who said that his name was "Nazir Griffiths," claimed that he was the director of nursing for lymphology at Memorial Sloan Kettering Hospital. (PSR ¶ 35).

Victim-4 and Brightman began dating. On September 8, 2023—two days after the incident with Victim-3—Brightman told Victim-4 that he was not feeling well because his father had late-stage cancer. (PSR ¶ 36). Victim-4, whose own mother was suffering from cancer, empathized, went to Brightman's apartment in New Jersey, and stayed the night. (PSR ¶ 36). They continued dating over the following several weeks until they had a series of arguments that resulted in Victim-4 blocking Brightman's number. (PSR ¶ 36).

On September 28, 2023, Brightman called and texted Victim-4 from a different phone number. Brightman claimed that he had just come from a chemotherapy appointment with his dad and was driving through the Bronx, where Victim-4 lived, on his way home, and asked to come to her apartment. (PSR ¶ 37). Victim-4 said that Brightman could come by.

About one hour after Brightman arrived, Victim-4 asked Brightman about his outbursts. Brightman became increasingly aggressive, and Victim-4 eventually told Brightman that he should leave. (PSR ¶ 38). Brightman said, in substance, "no bitch, I'm going to show you who I really am." Victim-4, who was in her bedroom, heard Brightman, who had been in the living room, go into the kitchen. (PSR ¶ 38). Brightman picked up a glass vinegar bottle and threw it directly at Victim-4's chest, hurting her. Brightman then tried to run into the bedroom where Victim-4 was. Victim-4 closed the door and was trying to lock it when Brightman began kicking and throwing his body at the door to open it. (PSR ¶ 38). Brightman yelled "I'm going to kill you bitch" and threw himself at the door, which broke and cracked open. (PSR ¶ 38).

Once Brightman was inside the bedroom, he picked up the vinegar bottle and threw it at Victim-4 again, but she dodged it. (PSR ¶ 39). Brightman jumped on top of Victim-4, who was on her bed, but she jumped off of the bed and tried to run out the door. (PSR ¶ 39). Brightman grabbed her, threw her on the bed, and choked her. While Brightman had his hand covering

Victim-4's mouth, he told her, in substance, that he was going to kill her, that he had nothing to live for anymore because his dad was dying, and that she would "not leave tomorrow." (PSR ¶ 39). Victim-4 could feel herself losing consciousness, and she stopped fighting. Brightman eventually removed his hand so that she could breathe.

As Victim-4 tried to speak to Brightman to calm him down, she repeatedly asked to use the bathroom as a way for her to potentially escape. Brightman eventually allowed her to do so, but watched her so she could not use the opportunity to flee. (PSR ¶ 40). When Victim-4 returned to the bedroom, Brightman directed her to get into the bed. Brightman began to touch Victim-4, but she said that she was hot and wanted to turn on the air conditioner. (PSR ¶ 40). Brightman then directed Victim-4 to take a shower while leaving the door of the bathroom open so that he could watch her as she showered. When Victim-4 was done, Brightman took a shower, keeping the door open as he did so in order to watch Victim-4 so she could not run away. (PSR ¶ 40). Victim-4 was able to return to the bedroom and discreetly text her friend for help.

After Brightman got out of the shower, he went into the living room to put on lotion, fully naked. (PSR ¶ 41). Victim-4 remained in the bedroom and continued texting her friend, who said that she was on her way. Brightman then told Victim-4 that she knew what was going to happen next, that he was sorry that she was "not going to leave tomorrow," and that Brightman was "sorry that it had to happen this way." (PSR ¶ 41).

Victim-4, knowing that her friend was on her way, went to the kitchen to pretend to clean up, while surreptitiously unlocking the door to her apartment. (PSR ¶ 42). Victim-4 eventually heard keys jingling, at which point Victim-4's friend (who had a key to the apartment) opened the door and burst inside. Victim-4 ran past her friend, out the door—partially naked—and went directly to a neighbor's apartment, asking to be let inside. (PSR ¶ 42). Victim-4's friend began screaming at Brightman to leave.

Victim-4's friend had contacted police on her way to the apartment, and officers arrived soon afterward. (PSR ¶ 43). They found Brightman inside a trash room in the lobby of Victim-4's apartment building. When officers asked Brightman what he was doing, he falsely claimed that he was attempting to buy marijuana from a friend. (PSR ¶ 43). Bodyworn camera reflects that, while officers detained Brightman to try to figure out what had happened—before they spoke to Victim-4 and her friend—Brightman was on his phone, typing rapidly. (PSR ¶ 43). Electronic records reflect that, while Brightman was standing in the lobby surrounded by officers, he was messaging Victim-4, begging her not to speak to the police or to tell them that he did anything wrong. Victim-4 and her friend, however, walked through the lobby and explained what happened, at which point officers arrested Brightman. (PSR ¶ 43).

## B. Procedural History and the Applicable Guidelines Range

After his arrest on September 28, 2023, Brightman was detained at Rikers Island. Brightman's jail calls reflect that, while at Rikers Island, he asked family members to contact women and others on his behalf. (PSR ¶ 46).

On December 11, 2023, Brightman was transferred into federal custody, after a grand jury returned an indictment charging him with kidnapping in relation to Victim-1 and her child; threatening harm by interstate communication and cyberstalking in relation to Victim-2;

kidnapping, travel in interstate commerce to commit a crime of violence, and travel in interstate commerce to stalk in relation to Victim-3; and kidnapping and travel in interstate commerce to commit a crime of violence in relation to Victim-4. (Dkt. No. 2).

On July 22, 2024, Brightman pleaded guilty to Counts Two and Eight of the Indictment, which charged him with making a threatening interstate communication (the August 14, 2023 call he made to Victim-2) and with travel in interstate commerce to commit a crime of violence (his travel from New Jersey to the Bronx to assault Victim-4 on September 28, 2023). Brightman pleaded guilty pursuant to a written plea agreement (the "Plea Agreement"), in which he also agreed that, on September 11, 2023, he traveled from New Jersey to the Bronx and followed Victim-3 from Victim-3's workplace to Victim-3's home, during which time Brightman assaulted, harassed, and threatened Victim-3. (*See* Ct. Ex. 1 at 2; PSR ¶ 64).

The Plea Agreement also contains a Guideline stipulation, which matches the Guideline calculation in the PSR. As part of that stipulation, the parties agreed that the total offense level for Count Eight (related to the assault of Victim-4) is 34, using a base offense level of 32, plus a two-point enhancement for the use of a dangerous weapon (the glass bottle that the defendant repeatedly threw at Victim-4). (PSR ¶¶ 12, 79–84). Because the groups formed with respect to the other victims have a total offense level that is more than nine levels less than 34, those groups are excluded from the offense level calculation. (PSR ¶¶ 12, 85). With a three-level reduction for acceptance of responsibility, the total offense level is 31. Brightman is in Criminal History Category I, which would result in a Guidelines range of 108 to 135 months' imprisonment. Because the counts of conviction carry a ten-year statutory maximum, however, his Guidelines range is 108 to 120 months' imprisonment.

The Probation Office recommends a sentence of 120 months' imprisonment.

### C. Discussion

#### 1. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification

Hon. John P. Cronan                                                                                      Page 11
April 3, 2025

is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550
F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

### 2.    A Sentence of 120 Months Is Appropriate

A sentence of 120 months is appropriate to reflect the seriousness of the defendant's
conduct, to account for his history and characteristics, to provide adequate deterrence, to protect
the public, and to promote respect for the law.

<u>Nature and Circumstances of the Offense</u>:  There is no legitimate question about the
seriousness of the defendant's conduct.  As the Court can see from the Victims' statements, the
defendant's actions left a lasting impact on them.  He destroyed the Victims' sense of security and
trust in others, and he instilled a foreboding sense of fear in their lives even to this day.

The defendant's physical assaults of the Victims are alone sufficient to warrant a ten-year
sentence.  He repeatedly abused Victim-1 over the course of several months, culminating in his
kidnapping her and Victim-1's two-year old minor child in the middle of the night at knifepoint.
The defendant's refusal to accept responsibility for this conduct itself speaks volumes.  And his
attempts to deny his conduct are entirely inconsistent with the evidence.  There is no dispute that
in early June 2022, Victim-1—a recent immigrant and a single mother to a two-year-old child—
felt compelled to make a police report after the defendant tried to strangulate her in Port Authority.
There is no dispute that later that month, a *bystander* felt compelled to call 911 after witnessing
the defendant force Victim-1 and her child out of his car and physically assault Victim-1 on the
street.  There is no dispute that on the night of the kidnapping, the defendant drove Victim-1 and
her child from their apartment in Mount Vernon to New Jersey at 1:30 a.m.  It is difficult to imagine
what innocent circumstances could have occurred that would have caused a mother to rouse a
toddler from sleep at 1:30 in the morning to get into a car to go to her boyfriend's apartment in
New Jersey.  Nor is it conceivable what could have caused her to call 911 later that day, so that
police could come to her boyfriend's apartment and rescue her and her two-year-old child.  It is no
small matter to call the police.  Particularly as a recent immigrant with a small child in tow.  Indeed,
Victim-1 and her toddler spent hours sitting on a bench in a New Jersey police precinct after the
police arrested the defendant on July 21, 2022.  There is little doubt that Victim-1 made that 911
call on that day because she felt that she had no other choice to save her and her child from the
defendant.[2]

---

[2] The defense submitted an "Investigation Report" (the "Report"), dated February 1, 2023, which
purports to be written by an investigator ("State Defense Investigator") working for the defendant's
New Jersey defense attorney.  (Dkt. No. 42, App'x 1).  The defense argues that the Report
demonstrates that Victim-1 "recanted" her allegations.  (*Id.*).  Even taking the Report—which has
neither been shown to Victim-1 nor adopted by her—at face value, it is hardly a recantation.  The
Report states that Victim-1 "voluntarily" went with the defendant to his home, but also that she
did so "out of fear of how he might react."  According to the Report, Victim-1 retracted her
statement that the defendant "punched her twice in the head" but Victim-1 maintained that the
defendant "hit her in the lip," causing an injury.  Although the report states that Victim-1 "felt that
she had no other choice but to lie to the police about Mr. Brightman having a knife on the day of
the incident," the next sentence explained that Victim-1 did so because she "felt that was her only
way of escaping from Mr. Brightman."  The Report reflects that Victim-1 maintained that "there

Hon. John P. Cronan                                                                        Page 12
April 3, 2025

    The defendant similarly committed shocking violence against Victim-2. Having insinuated his way into Victim-2's home, the defendant attacked Victim-2 in her own home. He used a knife to hold Victim-2 hostage in her own home and threatened to kill Victim-2—asking her which part of her body she wanted him to cut first and telling her that he was going to gut her like a fish. The defendant likewise roused Victim-3 from sleep in her own home and when he could not get what he wanted—i.e., in touch with Victim-2—he punched Victim-3 and then attempted to strangle her to the point where she felt it was difficult to breathe. Consistent with his conduct with Victims 1-3, the defendant similarly committed atrocious violence against Victim-4, restraining Victim-4 from leaving her own apartment, repeatedly threatening to kill her, including strangling Victim-4 with his hands. This conduct alone would warrant a significant sentence. But that is not all that the defendant did.

    The impact of the defendant's actions against the Victims is that much greater because the defendant was not a stranger but someone the Victims had trusted, or were beginning to trust. Victim-1 had spent months with the defendant, spending significant time at the defendant's residence in New Jersey, including with her minor child. Similarly, Victim-2 and Victim-4 welcomed the defendant into their homes. The defendant had practically lived at Victim-2's home for about a month. And even with Victim-3, with whom he had a short relationship, she trusted him enough to bring him to the doorstep of her home.

    The defendant came by this trust through deceit. The defendant purposefully posed as a nurse—going so far as to obtain a white lab coat embroidered with his name and a Memorial Sloan Kettering lanyard—and abused the trust that people so often associate with nurses. He lied to the

_____

was constant abuse throughout her relationship" with the defendant, and that "everything she lied about"—presumably, including that the defendant threatened her with a knife—"has happened in the past but it did not occur on the date of the incident."

When the Government asked Victim-1 about this interview, Victim-1 recalled speaking to an investigator working for the defendant's state defense attorney about wanting to drop the case because she had felt guilty about getting the defendant into trouble. Victim-1, however, denied ever telling anyone that she had lied to the police. Moreover, in or about March 2024, Victim-1 had evidently been contacted by an investigator working for the defendant's current counsel. There is no claim from the defense that Victim-1 retracted any of her statements to the second investigator. Instead, Victim-1's text messages with this investigator between March 2024 and November 2024, which are attached as Exhibit A, undermine the thrust of the Report. Throughout this time period, Victim-1 repeatedly reached out to the investigator to seek more information regarding the case, stating that she was "afraid of him" and wanting to know whether the defendant was still detained. Those text messages, and even the Report, reflect Victim-1's genuine fear of the defendant despite her feelings of guilt—a phenomenon that is not uncommon amongst survivors of domestic violence. *See, e.g.,* The Survivors Trust; Shame and Guilt, available at: https://tstresources.org/shame-and-guilt/#:~:text=If%20a%20survivor%20of%20abuse,the%20future%20if%20the%20abuse; Ask Amanda: I Feel Guilty for Putting Him Away, available at: https://www.domesticshelters.org/articles/ask-amanda/ask-amanda-i-feel-guilty-for-putting-him-away.

Hon. John P. Cronan                                                                                                    Page 13
April 3, 2025

Victims so that he could insinuate himself into their lives to give him the opportunity to control and abuse them.

Once the defendant tricked the Victims into relationships with him, he used further manipulation to silence them. He told Vicim-1—again, a recent immigrant and a single mother with a precarious job—that there was no point in calling the police on him because he would be released right away anyway. He shifted blame from himself to the Victims. After Victim-1 finally ended the relationship following the incident in July 2022, the defendant told Victim-1 that it was her fault that he was "broken." Similarly, during a party with Victim-2, the defendant repeatedly threatened to "smack" Victim-2 and to "handle" her when they get home, and blamed his threats of violence on her disrespect, prompting Victim-2 to say "I can never do anything right."

The defendant also calculatingly used his late father's illness as a shield.[3] When Victim-3 called the police after the defendant tried to strangle her, he repeatedly texted Victim-3 begging her to "help" him, stating "I'm losing my dad losing everything," "I'm going to lose my job and everything I worked hard for." Ironically, the defendant asked Victim-3 "why do everyone hurt me," and after Victim-3 responded simply "You hit me numerous times," the defendant threatened to "take my gun and kill myself" in another effort to guilt-trip Victim-3 into dropping the charges. When that did not work, the defendant went to Victim-3's work place to stalk and harass her in person.

Similarly, after the defendant was arrested by the police after he attacked and threatened to kill Victim-4, and while still in the custody of the police, he texted Victim-4, "please have a heart I don't wanna lose my license," "my dad dying," "imma love my job," "They gonna lock me up if you say I did something." Again, the defendant used his late father's illness and his fictional job and fictional license to try to manipulate Victim-4 into withdrawing her statements against the defendant. As with many abusers, the defendant attempted to shift the onus on to the Victims, claiming that it is they who are sending him to jail, getting him into trouble, rather than his own actions.

The defendant's violations of the Victim's physical and mental security left permanent scars. As the Victims' letters laid out with heartbreaking force, the defendant's actions have forced the Victims out of their apartments, out of their jobs, and, for Victim-4, even out of the city.

Defendant's Background and Need for Deterrence: The defendant's submission focuses on the defendant's need for mental health treatment and asserts that, as a "first offender," a short prison term will sufficiently deter the defendant. But the defendant's history—including his conduct after having been charged in this case—demonstrates that a ten-year sentence is necessary to protect the public.

---

[3] The defendant continues to use his late father's illness as a shield. He claims that in 2022 and 2023, he "dedicated himself to his father's full-time care," and "mov[d] into his father's home to provide physical and emotional support." (Docket No. 47). This claim is undermined by the Victims' statements and the cellphone location records. During the time that the defendant was dating Victim-2 in June through August of 2023, the defendant lived essentially full time with Vicim-2 at her apartment. Though he left for hours at a time during the day to take care of his father, that is a far cry from his description of the extent of his care for his late father. According to his cellphone location records, between June 2023 and September 2023, when he was arrested, the defendant's top locations were in West New York, New Jersey—where he told the Victims he lived and where the Victims had seen his apartment—and Jamaica, New York—nowhere near where his late father lived on Long Island.

When the defendant was arrested on September 28, 2023, after assaulting Victim-4, the incident marked his ninth arrest in four years. (PSR ¶¶ 94–97, 102–06). These arrests, convictions for disorderly conduct, conditional discharges, and time served sentences, far from deterring the defendant, emboldened him. As he told Victim-1, he could hurt her and get away with it because for years he did get away with it. Another short sentence would send the same message—that what he did was not serious, that he could get away with it. A substantial sentence is needed to provide adequate deterrence to the defendant and to those similarly situated to the defendant. A strong message must be sent that domestic violence is serious and carries serious punishment.

Specific deterrence is particularly important in this case where the defendant's post-arrest conduct shows little remorse for his actions, and instead, reflect continued efforts to downplay the extent of his conduct and to shift blame to others. While detained on Rikers Island, the defendant attempted to use his family to contact women who he thought may be able to help him. Even after he pled guilty in this case, the defendant continued to resist acceptance of the full extent of what he did to the Victims, and had insisted on calling the Victims to testify up until just last week. Even more troubling, after he pled guilty, and while the Government was attempting to resolve the sentencing without a *Fatico* hearing requiring the Victims to have to come to Court to face their abuser, the defendant attempted to take back to his cell certain witness statements material that he was barred from possessing, before an alert corrections officer intervened and confiscated the documents. (*See* Dkt. No. 39).

The defendant's statements to the defense-retained psychiatrist, Dr. Elie Aoun, similarly reflect a remarkable lack of reflection and personal accountability that undermine any confidence the Court should have in the defense's self-serving claim that a shorter sentence would provide adequate deterrence. Even after the defendant pled guilty, he claimed to Dr. Aoun that "They are using [the fact] that I was arrested on [charges of] domestic violence multiple times […], even though I was never convicted of anything, not even a misdemeanor." (Dkt. No. 42, App'x A at 12). The defendant justified his self-admitted temper issues by blaming others for not listening when he speaks normally, and that they listen when he "raise[s] [his voice] or break things," which he further explained is "not a crime." (Dkt. No. 42, App'x A at 11). The defendant continued to shift blame onto the Victims in this case by claiming that these relationships were "highly tumultuous marked by district as well as mutual verbal and emotional abuse." (Dkt. No. 42, App'x A at 11). At every turn, the defendant downplayed his own conduct and shifted blame to others for disrespecting him, for not listening to him, and for being verbally and emotionally abusive to him.

The defendant's post-arrest conduct and statements should not give the Court any comfort that the defendant has turned over a new page.

To the extent that the defendant argues that a lesser sentenced should be imposed in light of the defendant's mental health issues, the Government disagrees that this factor merits a sentence below 120 months. First, as the Court is well aware, the Government in offering a plea in the case has already come off of a high mandatory minimum term of imprisonment and much higher maximum exposure. To the extent that the Court believes the defendant's mental health conditions warrants any mitigation, the Government has already taken that into consideration in offering the plea that the defendant has taken. Second, the Court should taken into consideration the context of Dr. Aoun's evaluation. The defense retained Dr. Aoun for the express purpose of "assessing for the presence of mitigating psychiatric or psychological factors that could assist his defense

Hon. John P. Cronan                                                                                         Page 15
April 3, 2025

during his sentencing proceedings," rather than to conduct an independent evaluation of the
defendant's psychological profile. (Dkt. No. 42, Ex. A, at 1). Even putting aside that Dr. Aoun
had been retained specifically to find mitigation, there is another reason to question the report. Dr.
Aoun's report was based on two interviews with the defendant and certain past medical records.
Due to the nature of this report, Dr. Aoun received only Brightman's version of events, which, as
reflected in Dr. Aoun's report and in the defense submission—filed over one month after Dr.
Aoun's report was drafted—continued to deny substantial portions of his conduct. Indeed, it is
hard to square Dr. Aoun's diagnosis of "intermittent explosive disorder," a criteria of which is that
"the current aggressive outbursts are not premeditated and are not committed to achieve some
tangible objective (e.g., money, power, intimidation)" with the facts in this case. (Dkt. No. 42, Ex.
A, at 1). In view of the defendant's repeated deceitful and manipulative behavior, it is hard to
credit an evaluation of the defendant's conduct that it is "not premeditated" and was not calculated
to "achieve some tangible objective," namely control and intimidation of the victims. Indeed, if
this defendant can be diagnosed as suffering from intermittent explosive disorder, it is difficult to
think of any domestic violence abuser who would not qualify for the same disorder. It is also
difficult to credit any evaluation of the defendant that portrays the defendant as a passive player
who just happens to "find[] himself in repetitive patterns of troubled relationships," when he is the
one actively looking for women to deceive and then abuse.

          In any event, any mitigation warranted by the defendant's mental health evaluation must
be balanced against the need to protect the public. The Victims' letters to the Court make clear
that they are terrified of the defendant. Victim-2 wrote that it "would be such a relief to know for
an extended period of time I can live in peace and not have to watch over my shoulder." (Exhibit
B.) Victim-3 described how the effects of the defendant's actions "still somehow linger causing
me residual fearful moments that I find to be terrifying." (Exhibit C). And Victim-4 wrote of the
"horror, trauma, and resilience" she had endured, and her efforts to ensure that the defendant
"would never again be free to do this to another woman." (Exhibit D). In light of the defendant's
history as a repeat abuser, the nature of his violence, and the fact that he manipulated and stalked
women—in other words, his conduct was not limited to periodic explosive outbursts—he needs to
be incapacitated for a lengthy period. That is the only way that these Victims will feel safe and
the only way to prevent further victimization of additional women.

          <u>Just Punishment and Promoting Respect for the Law</u>:[4] The harm that the defendant
inflicted, as well as the fact that he continued his violent and manipulative behavior even after

---

[4] The defense also argues that the conditions at the MDC merit a downward variance. Many of
the judges' comments that the defense cites, however, were made in 2021 and 2022, during the
heart of the COVID-19 pandemic. The defendant did not arrive at the MDC until December 11,
2023, several weeks before Judge Furman issued his opinion in *United States v. Chavez*, 22 Cr.
303 (JMF), 2024 WL 50233 (S.D.N.Y. Jan. 4, 2024). Since then, Judge Caproni—who has been
closely involved in overseeing the conditions at the MDC—remarked:

          Let me just say, [the stories of horrible MDC conditions], that's just not true
          anymore. All of those [court] decisions that you read about were months ago.
          There's a lot more staffing at the MDC. The number of defendants who are ending
          up in lock down for substantial periods of time are minimal. . . . I can only say,
          MDC—look, it's a jail. But the horror stories from a year ago are just—it's not the

Hon. John P. Cronan                                                                    Page 16
April 3, 2025

repeated interactions with the criminal justice system, counsel in favor of a sentence at the top of the Guidelines. In considering what sentence provides just punishment and promotes respect for the law—as well as the "kinds of sentences available," *see* 18 U.S.C. § 3553(a)(3)—it is useful to consider how much prison time the defendant would actually serve if the Court imposes a sentence of 120 months. *See, e.g.*, *United States v. Tocco*, 135 F.3d 116, 131–32 (2d Cir. 1998) (finding no error in district court's consideration of anticipated good conduct time when calculating sentence).

As the Court is aware, an inmate can earn up to 54 days of "good time credit" per year of his sentence for satisfactory behavior.[5] *See* 18 U.S.C. § 3624(b)(1); *see generally Barber v. Thomas*, 560 U.S. 474, 476 (2010). Additionally, under the First Step Act, an inmate can also earn up to 15 days' earned time credit for every 30 days of successful participation in "evidence-based recidivism reduction programming" or other "productive activities." *See* 18 U.S.C. § 3632(d)(4); *see generally Claude v. Stover*, No. 3:24-cv-961 (KAD), 2025 WL 375074, *9 (D. Conn. Feb. 3, 2025). Up to 12 months of those credits can be applied to allow the inmate to begin his term of supervised release early, *see* 18 U.S.C. § 3624(g)(3), and the remaining credits can be applied to allow for early entry into "prerelease custody," *id.* § 3632(d)(4)(C), which can include a residential re-entry center or home confinement. Although these credits depend on the inmate's behavior, his Bureau of Prisons risk classification, and his participation in the programming, among other factors, the combination of good time credit and First Step Act credit can result in a significant reduction in an inmate's sentence. An analysis by the United States Attorney's Office for the Eastern District of New York, based on communications with various components of the Bureau of Prisons ("BOP"), estimated that a white-collar defendant sentenced to ten years' imprisonment could serve as little as six years in a BOP custodial facility after good time credit and First Step Act credits. *See United States v. James*, No. 19-382 (JS), Dkt. No. 259, at 9 (E.D.N.Y. Jan. 31, 2024).

By the same token, the 48-month sentence the defense requests could—after good time credit, First Step Act credit, and credit for the over 18 months the defendant has spent in custody—result in his release from a BOP custodial facility within one year. Such an outcome would not promote respect for the law or provide for a just punishment.

It is also worth noting that the defendant would face the same Guidelines range if the only crime he committed were the assault of Victim-4. But the defendant was responsible for so much more harm. As a result of his violence, Victim-2 was forced to move. She lived in fear on her commute, since the defendant knew her route, and had to see a therapist more often to deal with the "paranoia, depression, and crippling fear" caused by the defendant's conduct. (Exhibit B).

---

[same] facility [as it was then]. They have put a lot more staff on. They've got a lot more medical staff, and they're doing the best they can.

*United States v. Alexander et. al*, 24 Cr. 676 (VEC), Jan. 16, 2025 Tr. at 125.

[5] Previously, an inmate received good time credit based on the amount of time he actually served, which resulted in an effective cap of 47 days per year. The First Step Act of 2018 amended 18 U.S.C. § 3624(b)(1) so that inmates receive credit for the sentence actually imposed, not the time actually served, allowing them to earn up to 54 days of credit per year. *See* Pub. L. No. 115-391, 132 Stat. 5194, 5210 (2018).

Hon. John P. Cronan                                                                                               Page 17
April 3, 2025

Victim-3 also had to move to a new home. Her job had to relocate her to a new site.  In the short amount of time she knew the defendant, she was "beaten, suffocated, stalked, and threatened," causing her to continue to be afraid, and leaving her hoping that she will be able to "rebuild [her] life" to find "peace and sanity."  (Exhibit C).  And Victim-4 wrote that "[n]o words can fully capture the horror, trauma, and resilience" she endured because of the defendant, and she hopes that "every moment" the defendant spends in prison "serves as a reminder of the life you tried to take."  (Exhibit C).[6]

D.    **Conclusion**

The defendant forever altered the lives of the women at the center of this case.  The Government agrees with the Probation Office that a sentence of 120 months is necessary to satisfy the purposes of sentencing.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York

By:    ___/s/_____
       Patrick R. Moroney
       Ni Qian
       Assistant United States Attorneys
       (212) 637-2330 / -2364

cc:    Neil Kelly, Esq. (via ECF)

---

[6] The Government seeks a fine in the amount of $9,632 because that is the amount of money that the Government provided to the Victims to assist them in moving after the defendant destroyed the safety and security the Victims felt in their own homes.  We understand that the defendant claims he has no current ability to pay.  However, given that the defendant has demonstrated an ability to obtain and maintain employment--having done so between 2009 and 2022--the Court may base the fine on the defendant's potential future income. See United States v. Salameh, 261 F.3d 271, 276-77 (2d Cir.2001) (upholding a $250,000 fine contingent upon the realization of future earnings).

# EXHIBIT A

[REDACTED]

EXHIBIT B

Your honor,

My life will never be the same. The pain, fear, and PTSD of being with someone who abuses you mentally and physically is life altering. Meeting the defendant has changed my life forever.

The pain persisted even after the defendant was in custody. The psychological effects lingered, and I became extremely paranoid, even within the supposed safety of my own home. I constantly double- and triple-checked that all the doors and windows were locked. Scanning the street for cars or people I didn't recognize before walking towards my home. The defendant had broken into my previous apartment, and I was terrified he might find me again and do something even worse.

I even went out and bought pepper spray, which never left my side. I was afraid on the train on my way to work, constantly scanning the platform before the train doors opened because he was familiar with my route to work. He made it abundantly clear to me that he was a vengeful person and would "get back" anyone who wronged him.  Knowing this about him, I am still afraid of the defendant to this day.

For months, I lived in constant, agonizing fear. I didn't leave my house unless it was absolutely necessary. And when I did step outside, I did everything I could to avoid being alone.

My first apartment was a huge accomplishment for me, and I felt so proud to have my own place. Unfortunately, I had to move out because of the defendant. I couldn't comfortably be in my apartment after the indecent that could've easily been the end of my life. For approximately 3 months after the incident, before officially moving out, I only went to the apartment to grab a few of my things and I never went alone. I couldn't live it there anymore. It was a constant reminder of the most traumatic event in my life. It was a financial strain to continue paying rent for somewhere I was no longer living.  Unfortunately, 1 year later, I haven't been able to find another apartment that I can afford since then.

I've had to increase the frequency of seeing my therapist because of the paranoia, depression, and crippling fear this has all caused. It's been an extremely difficult time for me.  The defendant's behavior will have life long ramifications for me.

I hope and pray that the court shows no leniency on him and impose the maximum sentence. It would be such a relief to know for an extended period of time I can live in peace and not have to watch over my shoulder.

Thank you,
Victim 2

EXHIBIT C

April 1, 2025

Dear Judge Cronan,

I am writing to you as victim number three of this domestic violence case. I want to share my experiences and feelings regarding this matter.

I have been beaten, suffocated, stalked and threatened for my life in the short amount of time that I've known Herman Brightman, known as Nazir Griffiths. Writing this letter has brought back all those memories and emotions; but does not overpower my inner strength to help and put an end to what I have experienced. Herman Brightman has physically, emotionally and mentally affected his presence in my life negatively. My job had to relocate me to a different site. I had to relocate my children and myself to a new home and purchase a car all for my safety. And after all that, I still don't have peace and sanity because the effects of his actions still somehow linger causing me residual fearful moments that I find to be terrifying.

I ask for the court's understanding and support as I seek safety and justice. Your decision in this case will greatly impact my ability to move forward, rebuild my life and have that peace and sanity that things will be back to normal.

Thank you for your attention to this matter.

Sincerely,

Victim number three

# EXHIBIT D

To the Honorable Court,

Writing this letter has been one of the most difficult things I have ever had to do. No words can fully capture the horror, trauma, and resilience I have endured. But I refuse to let silence be the final word in this case.

Nazir Herman Brightman—whoever you choose to be today—I know that, in time, you will reap exactly what you have sown.

You preyed on my kindness, my empathy, my humanity. You chose to deceive me, masquerading as a nurse, exploiting the sacred trust placed in medical professionals. Whether your story of a dying father was truth or another manipulation, it stands as one of the most disturbing acts of deceit I have ever witnessed. You walked the halls of a hospital with practiced ease, wore a name embroidered on your scrubs, and lived a lie so deeply that even your routine mimicked that of a true caregiver. But there was nothing healing about your presence—only harm.

That fateful day, you thought you had found another victim. You believed I would be helpless, that fear would paralyze me, that I would submit. But you underestimated me. You underestimated the power of my will, the strength of my spirit. As you forced yourself upon me, as you squeezed the breath from my body, you thought you had won. But in that moment—on the brink of darkness— came clarity. A quiet but unshakable understanding: I would survive. And not only would I survive, but I would ensure that you would never again be free to do this to another woman.

The weight of your actions will not disappear with time. It will stain your name, echo through the years, and leave a mark on your bloodline that cannot be washed away. You do not deserve to move through this world unburdened by what you have done.

As I stand here today, I know that no sentence—whether ten years or life itself—could ever truly balance the scales of justice. But I take solace in knowing that I have done what so many before me were too afraid to do: I spoke. I fought. I made sure you were held accountable. Even as you stood in handcuffs, you still tried to manipulate me, pleading for mercy, as if your apologies meant anything. But they were not confessions of remorse—they were simply more of the same: a desperate attempt to control.

Let me be clear: I do not forgive you. I do not pity you. And I do not wish you peace. I hope that every day behind bars is slow and agonizing, that every moment serves as a reminder of the life you tried to take, and that you never, not for a single second, forget that in the end, I won.

Signed,
A Survivor